## 23-60570

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

UNITED STATES OF AMERICA

*Plaintiff-Appellant*

v.

KINDLE TERRELL SAM

*Defendant-Appellee*

FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION
3:22cr87TSL-LGI

# BRIEF OF APPELLANT

TODD W. GEE
*United States Attorney for the*
*Southern District of Mississippi*

JENNIFER CASE
Mississippi Bar Number 104238

KEVIN PAYNE
Mississippi Bar Number 100104
*Assistant United States Attorneys*
501 E. Court Street, Suite 4.430
Jackson, Mississippi  39201
(601) 965-4480

## STATEMENT REGARDING ORAL ARGUMENT

The United States does not request oral argument.  The issue on appeal—whether a federal firearms statute, 18 U.S.C. § 922(g)(3), is constitutional under the Second Amendment—can be considered fully by relying on the record and the briefs. *See* FED. R. APP. P. 34(a)(2)(C); FIFTH CIR. R. 28.2.3.

# TABLE OF CONTENTS

PAGE

STATEMENT REGARDING ORAL ARGUMENT...........................................ii

TABLE OF AUTHORITIES.................................................................... v

STATEMENT OF JURISDICTION .......................................................1

STATEMENT OF THE ISSUE ..............................................................2

STATEMENT OF THE CASE................................................................2

A.    Sam Keeps a Glock Pistol, and Associated Magazines and Ammunition, in the Same Room as Marijuana and Drug Paraphernalia ...........................................................................3

B.    Sam Seeks Dismissal of the Indictment Charging Him with Unlawfully Possessing a Gun While Using Illegal Drugs....................5

SUMMARY OF THE ARGUMENT....................................................6

ARGUMENT.....................................................................................7

Section 922(g)(3) Is Constitutional on Its Face and As Applied to Sam .........7

A.    Standard of Review .................................................................8

B.    Legal Background...................................................................8

    1.    Supreme Court Precedent:  *Heller*, *Bruen*, and *Rahimi* .................8

    2.    This Court's Now-Vacated *Daniels* Opinion ................................13

    3.    This Court's Recent *Connelly* Opinion...........................................13

    4.    The Challenged Provision:  Section 922(g)(3) .............................14

# TABLE OF CONTENTS (*Continued*)

C.   Discussion ....................................................................................15

    1.   Section 922(g)(3) is Constitutional in All Its Applications .........15

    2.   Section 922(g)(3) Is Constitutional on Its Face Because, at a Minimum, It Can Be Constitutionally Applied to Those Presently Under the Influence, Those Continually Impaired, and Violent Drug Users..........................................................................................24

    3.   Although the District Court Correctly Relied on *Daniels*, that Decision Has Been Vacated in the Light of *Rahimi*, Whose Reasoning Supports the Conclusion that § 922(g)(2) Is Constitutional on Its Face.................................................................42

    4.   Section 922(g)(3) Is Constitutional As Applied to Sam. .............46

    5.   If This Court Disagrees, It Should Remand for Further Consideration of Sam's As-Applied Challenge. ..........................47

CONCLUSION .....................................................................................50

CERTIFICATE OF SERVICE ................................................................1

CERTIFICATE OF COMPLIANCE .......................................................2

# TABLE OF AUTHORITIES

**Cases**                                                                    PAGE

*Andrus v. Texas*, 140 S.Ct. 1875 (2020)............................................................16

*Barrett v. United States*, 423 U.S. 212 (1976).....................................................7

*Bell v. Cone*, 535 U.S. 685 (2002) ........................................................................16

*Buford v. United States*, 532 U.S. 59 (2001) .......................................................17

*Dickerson v. New Banner Institute, Inc.*, 460 U.S. 103 (1983) .........................23

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ......................... 8, 23, 27, 37

*Florence v. Board of Chosen Freeholders*, 566 U.S. 318 (2012) ................... 15, 33

*Folajtar v. Att'y Gen.*, 980 F.3d 897 (3d Cir. 2020).........................................34

*Harmelin v. Michigan*, 501 U.S. 957 (1991) ............................................. passim

*Johnson v. United States*, 576 U.S. 591 (2015) ..................................................20

*Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90 (1991)......................................7

*Kanter. v. Barr*, 919 F.3d 437 (7th Cir. 2019) ....................................................32

*Kendall v. Ewert*, 259 U.S. 139 (1922) ...............................................................25

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ...........................................23

*Michigan v. Summers*, 452 U.S. 692 (1981) .......................................................18

*Muscarello v. United States*, 524 U.S. 125 (1998) .............................................20

*Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. 656 (1989)......... 21, 22

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S.Ct. 2111 (2022) 9, 10,
   18, 23

# TABLE OF AUTHORITIES (*Continued*)

**Cases**                                                                        PAGE

*Ramirez v. Collier*, 142 S.Ct. 1264 (2022) ...........................................................16

*Rehaif v. United States*, 139 S.Ct. 2191 (2019) ..................................................40

*Richards v. Wisconsin*, 520 U.S. 385 (1997) .......................................................20

*Rosemond v. United States*, 572 U.S. 65 (2014).................................................20

*Sir John Knight's Case*, 3 Mod. 117, 87 Eng. Rep. 75 (K.B. 1686)..................30

*Smith v. Texas*, 543 U.S. 37 (2004) .....................................................................16

*Smith v. United States*, 508 U.S. 223 (1993)........................................... 6, 20, 40

*State v. Shelby*, 2 S.W. 468 (Mo. 1886)...............................................................29

*United States v. Carter*, 750 F.3d 462 (4th Cir. 2014) ......................... 18, 21, 34

*United States v. Connelly*, 2024 WL 3963874 (5th Cir. 2024) ............... passim

*United States v. Daniels*, 77 F.4th 337 (5th Cir. 2023)........................... passim

*United States v. Daniels*, No. 23-376 (S.Ct. July 2, 2024)................................13

*United States v. DeLaurentis*, 230 F.3d 659 (3d Cir. 2000) ............................47

*United States v. Dugan*, 657 F.3d 998 (9th Cir. 2011) .....................................21

*United States v. McCowan*, 469 F.3d 386 (5th Cir. 2006)................................14

*United States v. Patterson*, 431 F.3d 832 (5th Cir. 2005) ................................20

*United States v. Perez-Macias*, 335 F.3d 421 (5th Cir. 2003)............................7

*United States v. Pope*, 613 F.3d 1255 (10th Cir. 2010)....................................47

*United States v. Rahimi*, 144 S.Ct. 1889 (2024) ....................................... passim

# TABLE OF AUTHORITIES (*Continued*)

**Cases**

PAGE

*United States v. Rodriguez-Rivera*, 918 F.3d 32 (1st Cir. 2019) .....................47

*United States v. Salerno*, 481 U.S. 739 (1987) .......................................... 24, 42

*United States v. Sampson*, 898 F.3d 270 (2d Cir. 2018) ...................................47

*United States v. Seay*, 620 F.3d 919 (8th Cir. 2010) ........................................21

*United States v. Veasley*, 98 F.4th 906 (8th Cir. 2024) ....................................42

*United States v. Yancey*, 621 F.3d 681 (7th Cir. 2010)....................... 19, 23, 36

*Wash. State Grange v. Wash. State Rep. Party*, 552 U.S. 442 (2008) ...............24

*Wilson v. Lynch*, 835 F.3d 1083 (9th Cir. 2016) ...............................................38

*Wong v. Belmontes*, 558 U.S. 15 (2009) ...........................................................16

# TABLE OF AUTHORITIES *(Continued)*

## Constitution & Statutes

PAGE

18 U.S.C. § 3231 ...............................................................................2

18 U.S.C. § 3731 ...............................................................................2

18 U.S.C. § 922 ..................................................................... passim

21 U.S.C. § 802 ...............................................................................14

21 U.S.C. § 812 ...............................................................................14

21 U.S.C. § 844 ...............................................................................14

28 U.S.C. § 1291 ...............................................................................2

Controlled Substances Act, 21 U.S.C. § 801 *et seq*.........................14

U.S. Const. amend. II...................................................................7, 8

## TABLE OF AUTHORITIES (*Continued*)

**Historical Authorities**                                        PAGE

1 George I, c.54 (1715) .......................................................................32

1 *Records of Governor & Company of the Massachusetts Bay in*
   *New England* (Nathaniel B. Shurtleff ed., 1853) ..................................32

1 W. & M. c.15 (1688) ......................................................................31

1 W. & M. c.2 ..................................................................................31

1 William Waller Hening, *Statutes at Large; Being a Collection of*
   *All the Law  of Virginia* (1823) ....................................................27

10 Guam Code Ann. § 60109.1 ............................................... 23, 30

11 George I, c.26 (1724) ....................................................................32

13 & 14 Car. 2, c.3 (1662) ..................................................................31

15 *The Public Records of the Colony of Connecticut from May, 1775,*
   *to June, 1776, Inclusive* (Charles J. Hoadly ed., 1890) .........................32

1692-1694 Mass. Acts 11-12 ...............................................................32

1696-1701 N.H. Laws 15 .....................................................................32

1775-1776 Mass. Acts 479 ...................................................................32

1776-1777 N.J. Laws 90 ......................................................................32

1777 N.C. Sess. Laws 231 ...................................................................32

1777 Pa. Laws 63 ..............................................................................32

1837 Mass. Acts 273 ..........................................................................29

# TABLE OF AUTHORITIES (*Continued*)

**Historical Authorities** (*cont'd*)                                   PAGE

1837 Me. Laws 424 ...................................................................29

1844 R.I. Pub. Laws 503 .........................................................29

1867 Kan. Sess. Laws 25 .........................................................29

1878 Miss. Laws 175-76 ..........................................................29

1883 Wis. Sess. Laws 290 ........................................................29

19 George II, ch. 39 (1746)......................................................32

1909 Idaho Sess. Laws 6 .........................................................29

2 Arthur Vollmer, U.S. Selective Serv. Sys., *Military Obligation:*
    *The American Tradition* (1947) ..............................................28

2 Bernard Schwartz, *The Bill of Rights:  A Documentary History* (1971)......32

3 Jac. I, c.5 (1605-06) ...........................................................31

4 *Journals of the Continental Congress* (1906) ....................................32

5 *Colonial Laws of New York* (1894)............................................28

6 N. Mar. I. Code § 10610 ......................................................23

7 Will. III c.5 (1695) (Ireland)..................................................31

720 Ill. Comp. Stat. § 5/24- 3.1 .................................................23

9 William Waller Hening, *Statutes at Large; Being a Collection of*
    *All the Laws of Virginia* (1821)...............................................32

Act of Apr. 1, 1870, ch. 426, § 2, 1869-1870 Cal. Stat. 585-586 ...................26

Act of Apr. 12, 1827, § 1, 1827 Mich. Terr. Laws 584-585 ..........................26

## TABLE OF AUTHORITIES (*Continued*)

**Historical Authorities** (*cont'd*)                                    PAGE

Act of Apr. 30, 1855, §§ 1-2, in 2 *The General Laws of the State of Calif., from 1850 to 1864,* (Theodore H. Hitchell ed., 1865)...........................27

Act of Aug. 18, 1876, ch. 112, § 147, 1876 Tex. Gen. Laws 188 ...................26

Act of Feb. 1, 1866, No. 11, § 10, 1866 Pa. Laws 10........................................26

Act of Feb. 21, 1872, § 1, 1872 Ill. Laws 477 ..................................................26

Act of Feb. 7, 1856, ch. 26, § 1, 1855-1856 N.M. Terr. Laws 94 (1856)........26

Act of Jan. 5, 1871, § 1, 68 *Ohio General and Local Laws and Joint Resolutions* 6 (1871)...................................................................................26

Act of July 25, 1874, ch. 113, § 1, 1874 Conn. Pub. Acts 256.......................26

Act of June 18, 1885, ch. 339, §§ 1-3, 1885 Mass. Acts 790...........................26

Act of Mar. 17, 1870, ch. 131, § 1, 1870 Wis. Gen. Laws 197 .......................26

Act of Mar. 2, 1868, ch. 60, § 5, *in The General Statutes of the State of Kansas* 553 (John M. Price *et al.* eds., 1868)...........................26

Act of Mar. 27, 1857, ch. 184, § 9, 1857 N.Y. Laws, Vol. 1 ...........................26

Act of Mar. 28, 1872, ch. 996, §§ 10-11, 1872 Ky. Acts, Vol. 2 .....................26

Act of Mar. 3, 1853, ch. 89, § 1, 1853 N.J. Acts 237 .......................................26

Act of Mar. 30, 1876, ch. 40, § 8, 19 Stat. 10 (District of Columbia) ...........26

Act of Mar. 31, 1873, ch. 57, §§ 1, 3, 1873 Miss. Laws 61-62........................26

Act of May 1, 1890, ch. 42, § 1, 1890 Iowa Acts 67........................................26

## TABLE OF AUTHORITIES (*Continued*)

**Historical Authorities** (*cont'd*)                                          PAGE

*Acts & Laws of the English Colony of Rhode-Island & Providence-Plantations*
    (Hall, 1767) ................................................................28

Ala. Code § 13A-11-72 ............................................................. 23, 30

Ark. Code Ann. § 5-73-309 ....................................................... 23, 30

Ark. Rev. Stat., ch. 78 (William McK. Ball & Sam C. Roane eds., 1838)....26

Cal. Penal Code § 29800 ...............................................................23

*Calendar of State Papers, Domestic: William III, 1700-1702*
    (Edward Bateson ed., 1937) ....................................................31

Colo. Rev. Stat. Ann. § 18-12-203 .............................................. 23, 30

Cong. Globe, 39th Cong., 1st Sess. (1866) ........................................33

D.C. Code § 7-2502.03 ..................................................................23

Del. Code Ann. tit. 11, § 1448 ........................................................23

Fla. Stat. Ann. § 790.06................................................................ 23, 30

Ga. Code Ann. § 16-11-129............................................................ 23, 30

Ga. Code Pt. 2, Tit. 2, Ch. 3, Art. 2, § 1803, at 358 (R. H. Clark *et al.*
    eds., 1861) ...............................................................................26

Haw. Rev. Stat. § 134-7 .............................................................. 23, 30

Idaho Code Ann. § 18-3302............................................................23

Ind. Code § 35-47-1-7 ................................................................. 23, 30

James Dunlop, *The General Laws of Pennsylvania* (2d ed. 1849)...................29

# TABLE OF AUTHORITIES (*Continued*)

**Historical Authorities** (*cont'd*)                                PAGE

Kan. Stat. Ann. § 21-6301 .......................................................... 23, 30

Ky. Rev. Stat. Ann. § 237.110 .................................................... 23, 30

Mass. Gen. Laws ch. 140, § 131 ................................................ 23, 30

Md. Code Ann., Public Safety § 5-133.................................... 23, 30

Minn. Stat. § 624.713 .......................................................................23

Minn. Terr. Rev. Stat. ch. 67, § 12, at 278 (1851) ..........................26

Mo. Rev. Stat. § 1274 (1879) .........................................................29

Mo. Rev. Stat. § 571.070.1 ......................................................... 23, 30

N.C. Gen. Stat. § 14-415.12......................................................... 23, 30

N.J. Stat. Ann. § 2C:58-3.c ............................................................30

N.J. Stat. Ann. § 2C:58-3.c ............................................................23

N.Y. Penal Law § 400.00.1.............................................................23

Nev. Rev. Stat. § 202.360.1 ............................................................23

Ohio Rev. Code § 2923.13 .......................................................... 23, 30

P.R. Laws Tit. 25, § 462a...............................................................30

P.R. Laws Tit. 25, § 462a...............................................................23

R.I. Gen. Laws § 11-47-6 ...............................................................23

S.C. Code Ann. § 16-23-30............................................................ 23, 30

S.D. Codified Laws § 23-7.7.1 .................................................... 23, 30

## TABLE OF AUTHORITIES (*Continued*)

**Historical Authorities** *(cont'd)*                                                                PAGE

*The Charters & General Laws of the Colony and Province of Massachusetts Bay* (1814) ................................................................27

Utah Code Ann. § 76-10- 503 ..........................................................23

V.I. Code tit. 23, § 456a ....................................................................23

W. Va. Code § 61-7-7.................................................................. 23, 30

# TABLE OF AUTHORITIES (*Continued*)

## Other Authorities

1 Edward Coke, *The First Part of the Institutes of the Lawes of England, or, A Commentarie upon Littleton* § 405 (1628) ......................................37

1 William Blackstone, *Commentaries on the Laws of England* (1765)............37

Albert Deutsch, *The Mentally Ill in America: A History of their Care and Treatment from Colonial Times* (1949) .............................................36

Benjamin Rush, *An Inquiry into the Effects of Ardent Spirits Upon the Human Body and Mind* (1812) .................................................... 25, 38

Bureau of Justice Statistics, Office of Justice Programs, U.S. Dep't of Justice, *Drugs & Crime Data—Fact Sheet: Drug-Related Crime* (Sept. 1994)............................................................................................17

Carl Erik Fisher, *Urge: Our History of Addiction* 47 (Penguin 2022) ..........38

Carlton F.W. Larson, *Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371 (2009)....................................................................................................36

Carrie B. Oser *et al.*, *The Drugs-Violence Nexus Among Rural Felony Probationers*, 24 J. Interpersonal Violence 1285 (Aug. 2009).........18

Crim. Justice Info Servs. Div., Fed. Bureau of Investigation, U.S. Dep't of Justice, *Federal Denials—Reasons Why the NICS Section Denies, November 30, 1998 – September 30, 2023*................................................41

Crim. Justice Info. Servs. Div., Fed. Bureau of Investigation, U.S. Dep't of Justice, *National Instant Criminal Background Check System 2022 Operational Repor* (2022)....................................................41

**TABLE OF AUTHORITIES** (*Continued*)

**Other Authorities** (*cont'd*)                                                    PAGE

Fed. R. Crim. P. 12.............................................................................46

H.R. Doc. No. 1486, 89th Cong., 2d Sess. 8 (1966) ........................................16

H.R. Doc. No. 407, 89th Cong., 2d Sess. 7 (1966) .........................................16

Henry Care, *English Liberties, or the Free-Born Subject's Inheritance*
    (6th ed. 1774)............................................................................36

Mark Edward Lender & James Kirby Martin, *Drinking in America:
    A History* (1987) ......................................................................28

Nat'l Archives, *Letter from Thomas Jefferson to Samuel Smith*, 3 May 1823.38

Office of National Drug Control Policy, Executive Office of the
    President, *ADAM II—2013 Annual Report, Arrestee Drug Abuse
    Monitoring Program II* (Jan. 2014)...........................................20

Randolph Roth, *'Why Guns Are and Are Not the Problem,'* in Jennifer
    Tucker, *et al., A Right to Bear Arms?: The Contested Role of History
    in Contemporary Debates on the Second Amendment* (2019) .................28

S. Rep. No. 1667, 89th Cong., 2d Sess. 13 (1966).........................................16

*Special Report—Drug Use, Dependence, and Abuse Among State Prisoners
    and Jail Inmates, 2007-2009* (rev. Aug. 10, 2020) ..................................17

*The Health Effects of Cannabis and Cannabinoids:  The Current State of
    Evidence and Recommendations for Research* (2017)....................... 16, 18

William Rawle, *A View of the Constitution of the United States of America*
    126 (2d ed. 1829).....................................................................32

**23-60570**

## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

UNITED STATES OF AMERICA

*Plaintiff-Appellant*

v.

KINDLE TERRELL SAM

*Defendant-Appellee*

FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION
3:22cr87TSL-LGI

## BRIEF OF APPELLANT

## STATEMENT OF JURISDICTION

The government brings this timely appeal from the district court's

grant of Kindle Sam's motion to dismiss the indictment, which charges

Sam with possessing a gun while being an unlawful user of illicit drugs, in

violation of 18 U.S.C. § 922(g)(3). ROA.130-31; R.E.4 (dismissal order).[1]  The

district court had jurisdiction. *See* 18 U.S.C. § 3231.  This Court's

jurisdiction is properly invoked. *See* 28 U.S.C. § 1291; 18 U.S.C. § 3731.  The

Solicitor General has authorized this appeal.

## STATEMENT OF THE ISSUE

Whether 18 U.S.C. § 922(g)(3), which prohibits gun possession by

unlawful users of controlled substances, violates the Second Amendment

on its face and as applied to Sam.

## STATEMENT OF THE CASE

Sam had a Glock pistol in his bedroom—a place where he also kept

marijuana and drug paraphernalia.  After a grand jury charged Sam with

unlawfully possessing a gun while using illegal drugs, the district court

(bound by this Court's decision in *Daniels*) dismissed the indictment

against Sam.  Because the challenged statute is constitutional on its face

and as applied to Sam, the district court's judgment should be reversed.

---

[1] "ROA.130-31" refers to pages 130 to 131 of the Record on Appeal; and "R.E." to Record Excerpt, cited by tab.

Alternatively, the judgment should be vacated and remanded for additional proceedings.

## A.    Sam Keeps a Glock Pistol, and Associated Magazines and Ammunition, in the Same Room as Marijuana and Drug Paraphernalia

In 2021, a tribal police department searched a home with written consent of the property owner. ROA.71.  In one bedroom—Sam's bedroom—officers found a Glock pistol, along with associated magazines and ammunition. ROA.71.  In that same room, they also found marijuana, electronic scales, and drug paraphernalia. ROA.71.  After being advised of his *Miranda* rights, Sam waived his right to an attorney and spoke voluntarily with the officers. ROA.71; *see* Figure 1 *infra* (photograph of gun and drug-related items found in Sam's bedroom).  In his voluntary statement, Sam admitted that the marijuana and gun belonged to him. ROA.71-72.  He also said that he had been smoking marijuana for approximately five years. ROA.72.



*Figure 1.*   Photograph of gun, magazines, drugs, and
drug paraphernalia seized from Sam's bedroom

**B.     Sam Seeks Dismissal of the Indictment Charging Him with Unlawfully Possessing a Gun While Using Illegal Drugs**

In 2022, a grand jury in the Southern District of Mississippi charged Sam with possessing a firearm while being an unlawful user of a controlled substance, in violation of 18 U.S.C. § 922(g)(3). ROA.9-10 (indictment).

Sam moved to dismiss the indictment, arguing that § 922(g)(3) violates the Second Amendment both facially and as applied to him. ROA.44-51.  The district court initially denied Sam's motion. ROA.88-90. Sam filed a motion to reconsider. ROA.94-111.  Before the district court ruled on Sam's motion to reconsider, this Court issued its opinion in *Daniels*, which considered the constitutionality of § 922(g)(3) as applied to an unlawful user of marijuana. *See United States v. Daniels*, 77 F.4th 337 (5th Cir. 2023), *vacated and remanded*, No. 23-376 (S.Ct. July 2, 2024).  Bound (at that time) by this Court's precedent in *Daniels*, the district court reversed its prior ruling and granted Sam's motion to dismiss the indictment as applied to him. ROA.130-31.

## SUMMARY OF THE ARGUMENT

Section 922(g)(3)'s temporary prohibition on firearm possession is fully consistent with the Second Amendment.  This Court recently confirmed that § 922(g)(3) is facially constitutional.  Moreover, the Supreme Court's recent decision in *Rahimi* supports the government's position that § 922(g)(3) is consistent with the historically rooted principle that the law may disarm categories of persons whose possession of a firearm would endanger themselves or others.  Consistent with that principle, Congress may temporarily disarm unlawful users of controlled substances during periods of active drug use, when they present a special danger of firearm misuse.  Thus, unlawful drug users, like Sam, may be disarmed temporarily—for the time that they misuse illegal drugs.

Because § 922(g)(3) is constitutional on its face and as applied to Sam, this Court should reverse the district court's judgment.  Alternatively, this Court should vacate the judgment and remand for additional proceedings.

# ARGUMENT

## Section 922(g)(3) Is Constitutional on Its Face and As Applied to Sam

"[D]rugs and guns are a dangerous combination." *Smith v. United States*, 508 U.S. 223, 240 (1993). The physiological effects of illegal drugs threaten to impair drug users' ability to handle firearms safely. Drug users often use firearms to commit crimes that fund their drug habit, to engage in violence during drug deals, to endanger police officers who are investigating their drug crimes, and to commit suicide.

Through § 922(g)(3), Congress sought to address those problems by disarming regular drug users and drug addicts. That prohibition lasts only as long as a person remains a regular user or addict. An individual can regain his ability to possess firearms by stopping his illegal drug abuse.

Congress adopted § 922(g)(3) to "keep firearms away from the persons [it] classified as potentially irresponsible and dangerous." *Barrett v. United States*, 423 U.S. 212, 218 (1976). Section 922(g)(3)'s temporary restriction on the possession of firearms by people who are actively engaged in unlawful drug use is consistent with "the right of the people to

7

keep and bear Arms." U.S. Const. amend. II.  The district court's dismissal of the indictment should be reversed or, alternatively, vacated and remanded for additional proceedings.

## A.    Standard of Review

This Court reviews constitutional questions *de novo*. *United States v. Perez-Macias*, 335 F.3d 421, 425 (5th Cir. 2003). *See Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 91 (1991) (describing scope of authority to "identify and apply" the law).

## B.    Legal Background

### 1.    Supreme Court Precedent:  *Heller*, *Bruen*, and *Rahimi*

The Second Amendment provides:  "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

#### a.    *Heller* Recognizes the Second Amendment Has Limits

In *Heller*, the Supreme Court held that the Second Amendment protects the right of "law-abiding, responsible citizens" to keep firearms in their homes for self-defense. *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008).  The *Heller* Court clarified that, "[l]ike most rights, the right secured

by the Second Amendment is not unlimited." *Id.* at 626.  And, it said that

"nothing in [its] opinion should be taken to cast doubt" on certain

"presumptively lawful regulatory measures," such as "longstanding

prohibitions on the possession of firearms by felons and the mentally ill."

*Id.* at 626-27 & n.26.

### b.   *Bruen* Abrogates Mean-End Analyses and Emphasizes Text and Tradition

In *Bruen*, the Supreme Court held that the Second Amendment

protects the right of "ordinary, law-abiding citizens" to "carry a handgun

for self-defense outside the home." *New York State Rifle & Pistol Ass'n, Inc. v.

Bruen*, 142 S.Ct. 2111, 2122 (2022).  The *Bruen* Court struck down a New

York law that required residents to demonstrate "proper cause" to obtain a

license to carry a handgun outside the home because that law

"prevent[ed] law-abiding citizens with ordinary self-defense needs from

exercising their right to keep and bear arms." *Id.* at 2122, 2156.

The *Bruen* Court explained that judicial review of gun laws should

focus on the Second Amendment's text and historical tradition.  A law

complies with the Second Amendment if it regulates conduct that falls

outside the Amendment's "plain text" or comports with "this Nation's

historical tradition of firearm regulation." 142 S.Ct. at 2126. "[C]ases

implicating unprecedented societal concerns or dramatic technological

changes" require an especially "nuanced approach," and the government

need only "identify a well-established and representative historical

*analogue*, not a historical *twin*." *Id.* at 2132-33 (emphases in original).

Analogical reasoning under the Second Amendment, thus, is not "a

regulatory straightjacket," and a modern law can satisfy *Bruen*'s historical

standard even if it is not "a dead ringer for historical precursors." *Id*. at

2133.

### c. *Rahimi* Clarifies and Applies *Bruen*'s Analytical Framework

In *Rahimi*, the Supreme Court held that 18 U.S.C. § 922(g)(8), which

prohibits firearm possession by an individual who is subject to a domestic

violence restraining order, does not violate the Second Amendment on its

face or as applied to the defendant in that case. *United States v. Rahimi*, 144

S.Ct. 1889, 1896-97 (2024). The *Rahimi* Court explained that "[s]ince the

founding, our Nation's firearm laws have included provisions preventing

individuals who threaten physical harm to others from misusing firearms."
*Id*. at 1896.  Those provisions include surety laws, which authorized
magistrates to "require individuals suspected of future misbehavior to post
a bond," and going armed laws, which "provided a mechanism for
punishing those who had menaced others with firearms." *Id*. at 1900-01.
The Supreme Court concluded that "[t]aken together, the surety and going
armed laws confirm" that "[w]hen an individual poses a clear threat of
physical violence to another, the threatening individual may be disarmed."
*Id*. at 1901.  The *Rahimi* Court acknowledged that "Section 922(g)(8) is by no
means identical to these founding era regimes," but it explained that "it
does not need to be":  Section 922(g)(8)'s  "prohibition on the possession of
firearms by those found by a court to present a threat to others fits neatly
within the tradition the surety and going armed laws represent." *Id*.

In reaching its decision, the Supreme Court clarified that its Second
Amendment precedents do not demand "a law trapped in amber"; the
Second Amendment "permits more than just those regulations identical to
ones that could be found in 1791." *Rahimi*, 144 S.Ct. at 1897-98.  As Justice

11

Barrett emphasized in concurrence, "imposing a test that demands overly specific analogues has serious problems," including "forc[ing] 21st-century regulations to follow late-18th-century policy choices," and "assum[ing] that founding-era legislatures maximally exercised their power to regulate." *Id*. at 1925 (Barrett, J., concurring).

Accordingly, the *Rahimi* Court explained that, when assessing whether a law complies with the Second Amendment, courts should consider "whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition" by ascertaining "whether the new law is 'relevantly similar' to laws that our tradition is understood to permit." *Rahimi*, 144 S.Ct. at 1898 (emphasis added).  Under this standard, "if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations." *Id*.  But even "when a challenged regulation does not precisely match its historical precursors, 'it still may be analogous

enough to pass constitutional muster,' " so long as the law "comport[s]

with the principles underlying the Second Amendment." *Id*.

### 2.    This Court's Now-Vacated *Daniels* Opinion

Before the district court issued its order dismissing the indictment

here—and before the Supreme Court issued its opinion in *Rahimi*—a panel

of this Court held that § 922(g)(3) was unconstitutional as applied to a

defendant who admitted to using marijuana "approximately fourteen days

out of a month." *United States v. Daniels*, 77 F.4th 337, 340 (5th Cir. 2023),

*vacated and remanded*, No. 23-376 (S.Ct. July 2, 2024).  The *Daniels* Court did

not "invalidate [§ 922(g)(3)] in all its applications, but, importantly, only as

applied to Daniels." *Id*. at 355.  This *Daniels* decision was vacated by the

Supreme Court following its issuance of the *Rahimi* decision. *United States

v. Daniels*, No. 23-376 (S.Ct. July 2, 2024).

### 3.    This Court's Recent *Connelly* Opinion

Before revisiting the *Daniels* case, this Court issued a decision in

*Connelly*, a case that presented a facial and as-applied challenge to

§ 922(g)(3). *United States v. Connelly*, 2024 WL 3963874 (5th Cir. 2024).  The

Court found that § 922(g)(3) is facially constitutional. *Id*. at *10 ("[O]ur

history and tradition of firearms regulation show that there are indeed

some sets of circumstances where § 922(g)(3) would be valid, such as

banning presently intoxicated persons from carrying weapons.").  The

Court found § 922(g)(3) unconstitutional as-applied to a woman who used

marijuana occasionally as a sleep aid or anxiety reducer. *Id*.

### 4.    The Challenged Provision:  Section 922(g)(3)

Section 922(g)(3) makes it a crime for a person to possess a firearm if

he "is an unlawful user" of "any controlled substance." 18 U.S.C.

§ 922(g)(3).  The word "user" refers to someone who engages in the regular

use of a controlled substance. *See United States v. McCowan*, 469 F.3d 386,

392 (5th Cir. 2006).  A "controlled substance" is a drug or other substance

that is listed in one of the schedules of the Controlled Substances Act, 21

U.S.C. § 801 *et seq*. *See* 18 U.S.C. § 922(g)(3); 21 U.S.C. § 802(6).  Marijuana,

the drug at issue here, is a controlled substance. *See* 21 U.S.C. § 812(c),

Schedule I(c)(10).  Simple possession of marijuana is a misdemeanor, and

possession after a previous conviction for a drug offense is a felony. *See* 21

U.S.C. § 844(a).  The Second Amendment allows Congress to disarm the

unlawful drug users covered by § 922(g)(3), including Sam.

## C.    Discussion

### 1.    Section 922(g)(3) is Constitutional in All Its Applications

Section 922(g)(3) is consistent with the historically rooted principle

that the government may disarm categories of persons whose possession of

a firearm would endanger themselves or others.  Accordingly,

Section 922(g)(3)'s categorical and temporary prohibition on the possession

of firearms by unlawful users of illegal controlled substances is

constitutional in all its applications.[2]

#### a.    Those who misuse and abuse illegal drugs endanger society in many ways.

Armed drug users endanger society in multiple ways.  *First*, drug

users pose a threat to mishandle firearms—or use firearms to commit

crimes—because of "drug-induced changes in physiological functions,

---

[2] The government's position is that § 922(g)(3) is not subject to as-applied challenges because it is constitutional in all its applications.  The government makes this argument to preserve it, knowing that the *Connelly* Court found § 922(g)(3) unconstitutional in one application. *Connelly*, 2024 WL 3963874, at *10.

cognitive ability, and mood." *Harmelin v. Michigan*, 501 U.S. 957, 1002

(1991) (Kennedy, J., concurring in part and concurring in the judgment); *see*

*Florence v. Board of Chosen Freeholders*, 566 U.S. 318, 332 (2012) ("The use of

drugs can embolden [individuals] in aggression.").  The effects of

marijuana intoxication, for example, include an altered "perception of

time," "decreased short-term memory," and "impaired perception and

motor skills."  National Academies of Sciences, Engineering, and Medicine,

*The Health Effects of Cannabis and Cannabinoids:  The Current State of Evidence*

*and Recommendations for Research* 53 (2017) (hereinafter *Health Effects*).

    *Second*, illegal drug users often "commit crime in order to obtain

money to buy drugs"—and, thus, pose a danger of using firearms to

facilitate such crime.  *Harmelin*, 501 U.S. at 1002 (Kennedy, J., concurring in

part and concurring in the judgment).  In the years before § 922(g)(3)'s

enactment, President Lyndon B. Johnson and both Houses of Congress

recognized that drug use often motivates crime.[3]  Supreme Court cases are

---

[3] *See* H.R. Doc. No. 407, 89th Cong., 2d Sess. 7 (1966) (presidential message)
("Drug addiction . . . drives its victims to commit untold crimes to secure the means to

likewise replete with examples of crimes motivated by drug habits.[4]  And,

in one study, around 20% of state inmates—and nearly 40% of state

inmates who were incarcerated for property crimes—stated that they

committed their crimes to obtain drugs or money for drugs. *See* Jennifer

Bronson *et al.*, Bureau of Justice Statistics, Office of Justice Programs, U.S.

Dep't of Justice, *Special Report—Drug Use, Dependence, and Abuse Among*

*State Prisoners and Jail Inmates, 2007-2009*, at 6 (rev. Aug. 10, 2020)

(hereinafter *Drug Use*).

---

support their addiction."); H.R. Rep. No. 1486, 89th Cong., 2d Sess. 8 (1966) ("Narcotic addicts in their desperation to obtain drugs often turn to crime in order to obtain money to feed their addiction."); S. Rep. No. 1667, 89th Cong., 2d Sess. 13 (1966) (observing that drug users can be driven "to commit criminal acts in order to obtain money with which to purchase illegal drugs").

[4] *See, e.g., Ramirez v. Collier*, 142 S.Ct. 1264, 1296 (2022) (Thomas, J., dissenting) ("the brutal slaying of a working father during a robbery spree to supply a drug habit"); *Andrus v. Texas*, 140 S.Ct. 1875, 1877 (2020) (per curiam) ("To fund a spiraling drug addiction, [she] turned to prostitution" and "began selling drugs."); *Wong v. Belmontes*, 558 U.S. 15, 15-16 (2009) (per curiam) ("bludgeoned [the victim] to death, . . . stole [her] stereo, sold it for $100, and used the money to buy beer and drugs"); *Smith v. Texas*, 543 U.S. 37, 41 (2004) (per curiam) ("regularly stole money from family members to support a drug addiction"); *Bell v. Cone*, 535 U.S. 685, 703 (2002) ("In an apparent effort to fund this growing drug habit, he committed robberies."); *Buford v. United States*, 532 U.S. 59, 62 (2001) ("robberies had been motivated by her drug addiction").

*Third*, "violent crime may occur as part of the drug business or culture." *Harmelin*, 501 U.S. at 1002 (Kennedy, J., concurring in part and concurring in the judgment).  Such violence can involve not only drug dealers, but also their customers.  For example, violence may result from "disputes and ripoffs among individuals in volved in the illegal drug market." Bureau of Justice Statistics, Office of Justice Programs, U.S. Dep't of Justice, *Drugs & Crime Data—Fact Sheet:  Drug-Related Crime* 3 (Sept. 1994); *see, e.g.*, Carrie B. Oser *et al.*, *The Drugs-Violence Nexus Among Rural Felony Probationers*, 24 J. INTERPERSONAL VIOLENCE 1285, 1288 (Aug. 2009) ("A drug deal gone wrong may frequently progress to victimization and violence.").  Guns increase both the likelihood and the lethality of such drug violence.

*Fourth*, armed drug users endanger the police.  "[D]ue to the illegal nature of their activities, drug users and addicts would be more likely than other citizens to have hostile run-ins with law enforcement officers," and such encounters "threaten the safety" of the officers "when guns are involved." *United States v. Carter*, 750 F.3d 462, 469 (4th Cir. 2014) (citation

18

omitted); *see Michigan v. Summers*, 452 U.S. 692, 702 (1981) ("[T]he execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence.").

*Fifth*, armed drug users endanger themselves. Most gun deaths in the United States result from suicide, not homicide. *See Bruen*, 142 S.Ct. at 2164 (Breyer, J., dissenting) (noting that 61% of gun deaths are suicides and 37% are homicides). And, drug users, including marijuana users, pose a higher risk of suicide than ordinary citizens. *See Health Effects*, at 311.

Because armed drug users pose dangers to society that extend beyond the risk that they will mishandle firearms while under the influence of the drug, Congress may disarm drug users even between periods of drug intoxication.[5] *But see Connelly*, 2024 WL 3963874, at *10 (holding that presently intoxicated persons can be disarmed).

---

[5] Even if a court considers only the risk that a person will misuse firearms while under the influence of drugs, § 922(g)(3) still complies with the Second Amendment. Drug users who possess guns are apt to retain possession while under the influence. They are unlikely to put their guns away before using drugs and to retrieve them only after regaining sobriety. In this case, for example, Sam's Glock pistol was in the same bedroom as his marijuana and drug paraphernalia. ROA.71. He admitted to using marijuana for about five years, which undoubtedly overlapped with his gun possession.

### b. Data demonstrate, and judicial opinions acknowledge, the dangers caused by drug misuse and abuse.

Studies "bear out" the conclusion that armed drug users present a special danger to themselves and others. *Harmelin*, 501 U.S. at 1003 (Kennedy, J., concurring in part and concurring in the judgment); *see United States v. Yancey*, 621 F.3d 681, 686 (7th Cir. 2010) (per curiam) ("Ample academic evidence confirms the connection between drug use and violent crime.").  In one study, "over 60 percent of adult male arrestees . . . tested positive for some drug in their system at the time of arrest," and "a large portion of those arrestees tested positive for marijuana." Office of National Drug Control Policy, Executive Office of the President, *ADAM II—2013 Annual Report, Arrestee Drug Abuse Monitoring Program II*, at 38 (Jan. 2014). In another, 42% of state prisoners stated that they were drug users at the time of their crimes. *Drug Use*, at 6.

---

ROA.71-72.  These facts strongly suggest that Sam possessed firearms while under the influence of illegal drugs— vindicating Congress's judgment that persons such as Sam cannot be trusted to carry arms responsibly in the first place.

Judicial decisions, too, acknowledge the dangers posed by armed

drug users.  Many Supreme Court decisions describe "drugs and guns" as

a "dangerous combination."[6]  This Court has recognized that drug users

are likelier than ordinary citizens to misuse firearms. *See United States v.*

*Patterson*, 431 F.3d 832, 836 (5th Cir. 2005) ("[U]nlawful users of controlled

substances pose a risk to society if permitted to bear arms.").  Other courts

of appeal agree.[7]

In particular, the Supreme Court's decision in *National Treasury*

*Employees Union versus Von Raab*, 489 U.S. 656 (1989), supports § 922(g)(3)'s

---

[6] *Rosemond v. United States*, 572 U.S. 65, 75 (2014) (citation omitted); *see Muscarello v. United States*, 524 U.S. 125, 132 (1998); *Smith*, 508 U.S. at 240; *see also Johnson v. United States*, 576 U.S. 591, 642 (2015) (Alito, J., dissenting) ("Drugs and guns are never a safe combination."); *Harmelin*, 501 U.S. at 1003 (Kennedy, J., concurring in part and concurring in the judgment) ("[There is a] direct nexus between illegal drugs and crimes of violence."); *Richards v. Wisconsin*, 520 U.S. 385, 391 n.2 (1997) ("This Court has encountered before the links between drugs and violence.").

[7] *See, e.g., Carter*, 750 F.3d at 470 (4th Cir.) ("[D]rug use, including marijuana use, frequently coincides with violence."); *Yancey*, 621 F.3d at 685 (7th Cir.) ("[H]abitual drug abusers . . . are more likely to have difficulty exercising self-control, making it dangerous for them to possess deadly firearms."); *United States v. Seay*, 620 F.3d 919, 925 (8th Cir. 2010) ("[I]n passing § 922(g)(3), Congress expressed its intention to 'keep firearms out of the possession of drug abusers, a dangerous class of individuals.'") (citation omitted); *United States v. Dugan*, 657 F.3d 998, 999 (9th Cir. 2011) ("[W]e see the same amount of danger in allowing habitual drug users to traffic in firearms as we see in allowing felons and mentally ill people to do so.").

constitutionality.  That case involved a claim that suspicionless drug testing as a condition of promotion to certain federal jobs violated the Fourth Amendment. *Id*. at 659-663.  The Supreme Court upheld the drug-testing requirement as applied to those who sought jobs that required them to carry firearms. *See id*. at 664.  The Court emphasized "the extraordinary safety . . . hazards that would attend the promotion of drug users to positions that require the carrying of firearms." *Id*. at 674.[8]  Similar hazards justify § 922(g)(3).

---

[8] *See, e.g., Treasury Employees*, 489 U.S. at 670 ("The public interest . . . demands effective measures to prevent the promotion of drug users to positions that require the incumbent to carry a firearm."); *id*. ("[E]ven a momentary lapse in attention [by an employee carrying a firearm] can have disastrous consequences."); *id*. at 671 ("[T]he public should not bear the risk that employees who may suffer from impaired perception and judgment will be promoted to positions where they may need to employ deadly force."); *id*. at 679 ("The Government's compelling interests in preventing the promotion of drug users to positions where they might endanger . . . the life of the citizenry outweigh the privacy interests of those who seek promotion to these positions.").

### c.    Multiple legislative bodies have disarmed drug users and addicts

Congress is not alone in disarming drug users and drug addicts.  At least 32 states and territories have adopted similar laws.[9]  This legislative consensus confirms that drug users are not, in fact, among those protected from disarmament by the Second Amendment.  It also distinguishes § 922(g)(3) from the outlier gun laws found unconstitutional in *District of Columbia v. Heller*, 554 U.S. 570 (2008), *McDonald v. City of Chicago*, 561 U.S. 742 (2010), and *Bruen*.

---

[9] *See* Ala. Code § 13A-11-72(b); Ark. Code Ann. § 5-73-309(7)(A); Cal. Penal Code § 29800(a)(1); Colo. Rev. Stat. Ann. § 18-12-203(1)(f); Del. Code Ann. tit. 11, § 1448(a)(3); D.C. Code § 7-2502.03(a)(4)(A); Fla. Stat. Ann. § 790.06(2)(e)-(f ); Ga. Code Ann. § 16-11-129(b)(2)(I)-(J); 10 Guam Code Ann. § 60109.1(b)(5)-(6); Haw. Rev. Stat. § 134-7(c)(1); Idaho Code Ann. § 18-3302(11)(e); 720 Ill. Comp. Stat. § 5/24- 3.1(a)(3); Ind. Code § 35-47-1-7(5); Kan. Stat. Ann. § 21-6301(a)(10); Ky. Rev. Stat. Ann. § 237.110(4)(d); Md. Code Ann., Public Safety § 5-133(b)(5); Mass. Gen. Laws ch. 140, § 131(d)(iii)(A); Minn. Stat. § 624.713(10)(iii); Mo. Rev. Stat. § 571.070.1(2); Nev. Rev. Stat. § 202.360.1(f ); N.J. Stat. Ann. § 2C:58-3.c(3); N.Y. Penal Law § 400.00.1(e); N.C. Gen. Stat. § 14-415.12(b)(5); 6 N. Mar. I. Code § 10610(a)(3); Ohio Rev. Code § 2923.13(A)(4); P.R. Laws Tit. 25, § 462a(a)(3); R.I. Gen. Laws § 11-47-6; S.C. Code Ann. § 16-23-30(A)(1); S.D. Codified Laws § 23-7.7.1(3); Utah Code Ann. § 76-10- 503(1)(b)(iv); V.I. Code tit. 23, § 456a(a)(3); W. Va. Code § 61-7-7(a)(3).

**d.    Section 922(g)(3) prevents gun possession only as long as a person abuses drugs**

Finally, Section 922(g)(3) disarms a person only if he "*is* an unlawful user of or addicted to any controlled substance." 18 U.S.C. § 922(g)(3) (emphasis added); *see Dickerson v. New Banner Institute, Inc.*, 460 U.S. 103, 116 (1983) (discussing the significance of the verb tenses in § 922(g)).  The disqualification thus applies "only so long as [a person] abuses drugs"; a user can "regain his right to possess a firearm simply by ending his drug abuse." *Yancey*, 621 F.3d at 686-87.  This limit makes § 922(g)(3)'s constitutionality particularly clear.  The Second Amendment protects the right to possess arms, but it does not entitle anyone "to simultaneously choose both gun possession and drug abuse." *Id*. at 687.

**2.    Section 922(g)(3) Is Constitutional on Its Face Because, at a Minimum, It Can Be Constitutionally Applied to Those Presently Under the Influence, Those Continually Impaired, and Violent Drug Users.**

A law is not facially unconstitutional unless " 'no set of circumstances exists under which the Act would be valid,' *i.e.*, . . . the law is unconstitutional in *all of its applications*." *Wash. State Grange v. Wash. State*

*Republican Party*, 552 U.S. 442, 449 (2008) (emphasis added) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).  As this Court held in *Connelly*, and as explained below, our Nation's historical tradition establishes that § 922(g)(3) may be constitutional as applied to those presently under the influence, those continually impaired, and violent drug users. *Connelly*, 2024 WL 3963874, at *10.  Because this historical tradition supports § 922(g)(3)'s application in some circumstances, § 922(g)(3) is constitutional on its face. *Id.* ; *Wash. State Grange*, 552 U.S. at 449.[10]

### a.   Laws Disarming the Intoxicated

Historical laws regulating firearm possession and use by those under the influence of alcohol support Congress's authority, at a minimum, to disarm those presently under the influence of controlled substances.

---

[10] This Court's now-vacated *Daniels* opinion explains that our Nation's historical tradition establishes that § 922(g)(3) may be constitutional as applied to those who are "presently under the influence," 77 F.4th at 348; those whose drug use is "so regular and so heavy" that they are "continually impaired," *id.* at 350; and those whose drug use "predisposes [them] to armed conflict" or who have "a history of drug-related violence," *id.* at 354.

The Founding generation recognized that those who regularly became intoxicated threatened the social and political order. *See, e.g.*, Benjamin Rush, *An Inquiry into the Effects of Ardent Spirits Upon the Human Body and Mind* 6 (1812) (describing drunkenness as a "temporary fit of madness"). Indeed, States have long done more than ban gun possession while drunk. In the 19th century, many States enacted statutes allowing "habitual drunkards" to be committed to asylums or placed under guardians in the same manner as "lunatics." *Kendall v. Ewert*, 259 U.S. 139, 146 (1922) (citation omitted).[11] This Court has recognized that, because

---

[11] *See, e.g.*, Act of Mar. 30, 1876, ch. 40, § 8, 19 Stat. 10 (District of Columbia); Ark. Rev. Stat., ch. 78, § 1, at 456 (William McK. Ball & Sam C. Roane eds., 1838); Act of Apr. 1, 1870, ch. 426, § 2, 1869-1870 Cal. Stat. 585-586; Act of July 25, 1874, ch. 113, § 1, 1874 Conn. Pub. Acts 256; Ga. Code Pt. 2, Tit. 2, Ch. 3, Art. 2, § 1803, at 358 (R. H. Clark *et al.* eds., 1861); Act of Feb. 21, 1872, § 1, 1872 Ill. Laws 477; Act of May 1, 1890, ch. 42, § 1, 1890 Iowa Acts 67; Act of Mar. 2, 1868, ch. 60, § 5, *in The General Statutes of the State of Kansas* 553 (John M. Price *et al.* eds., 1868); Act of Mar. 28, 1872, ch. 996, §§ 10-11, 1872 Ky. Acts, Vol. 2, at 523-524; Act of July 8, 1890, No. 100, § 1, 1890 La. Acts 116; Act of Mar. 5, 1860, ch. 386, §§ 6-7, 1860 Md. Laws 607-608; Act of June 18, 1885, ch. 339, §§ 1-3, 1885 Mass. Acts 790; Act of Apr. 12, 1827, § 1, 1827 Mich. Terr. Laws 584-585; Minn. Terr. Rev. Stat. ch. 67, § 12, at 278 (1851); Act of Mar. 31, 1873, ch. 57, §§ 1, 3, 1873 Miss. Laws 61-62; Act of Mar. 3, 1853, ch. 89, § 1, 1853 N.J. Acts 237; Act of Feb. 7, 1856, ch. 26, § 1, 1855-1856 N.M. Terr. Laws 94 (1856); Act of Mar. 27, 1857, ch. 184, § 9, 1857 N.Y. Laws, Vol. 1, at 431; Act of Jan. 5, 1871, § 1, 68 *Ohio General and Local Laws and Joint Resolutions* 6 (1871); Act of Feb. 1, 1866, No. 11, § 10, 1866 Pa. Laws 10; Act of Aug. 18, 1876, ch. 112, § 147, 1876 Tex. Gen. Laws 188; Act of Mar. 17, 1870, ch. 131, § 1, 1870 Wis. Gen. Laws 197.

those with mental illness could be imprisoned historically, such persons could necessarily be deprived of their right to bear arms. *See Connelly*, 2024 WL 3963874, at *3-4.  The same is true of those who are comparably intoxicated. *Id*.  In addition, at least one State in the mid-19th century specifically disarmed "common drunkards."[12]

Going back even farther, a 1658 Massachusetts law, for example, allowed constables to apprehend those "overtaken with drink" and keep them "in close custody" until brought before a magistrate. *The Charters & General Laws of the Colony and Province of Massachusetts Bay* 82 (1814). Founding-era legislatures also adopted specific measures to separate firearms and alcohol, including regulating firearm use by individuals deemed likely to become intoxicated.  A 1655 Virginia law prohibited "shoot[ing] any gunns at drinkeing [events]," regardless of whether attendees became intoxicated. 1 William Waller Hening, *Statutes at Large; Being a Collection of All the Laws of Virginia* 401-02 (1823).  A 1771 New York

---

[12] *See* Act of Apr. 30, 1855, §§ 1-2, in 2 *The General Laws of the State of California, from 1850 to 1864, inclusive* 1076-1077 (Theodore H. Hitchell ed., 1865).

law similarly barred firing guns during the New Year's holiday, a restriction that "was aimed at preventing the 'great Damages . . . frequently done on [those days] by persons . . . being often intoxicated with Liquor." *Heller*, 554 U.S. at 632 (quoting 5 *Colonial Laws of New York* 244-46 (1894)).  And, a 1731 Rhode Island law forbade firing guns or pistols in any tavern at night. *See Acts & Laws of the English Colony of Rhode-Island & Providence-Plantations* 120 (Hall, 1767).

Militia laws from the 1700s likewise reflect early legislatures' judgments about the dangers of allowing intoxicated individuals to carry firearms.  New Jersey, Pennsylvania, and South Carolina disarmed or authorized the confinement of intoxicated militia members. *See* 2 Arthur Vollmer, U.S. Selective Serv. Sys., *Military Obligation:  The American Tradition*, pt. 8, New Jersey, at 25-26 (1947) (1746 law disarming those who appeared "in [a]rms disguised in [l]iquor"); *id.* pt. 11, Pennsylvania, at 97 (1780 law disarming those "found drunk"); *id.* pt. 13, South Carolina, at 96 (1782 law allowing officers to be cashiered or "confined till sober").  Similar laws persisted into the 1800s, *see, e.g.*, James Dunlop, *The General Laws of*

*Pennsylvania* 405-06 (2d ed. 1849) (1822 law)—by which time at least three states outright excluded "common drunkards" from the militia, *see* 1844 R.I. Pub. Laws 503; 1837 Me. Laws 424; 1837 Mass. Acts 273.

During the 19th century, as social norms surrounding—and attitudes about—alcohol changed, and as firearms became less cumbersome,[13] limits (including criminal penalties) on the carry, use, and receipt of firearms or pistols by intoxicated individuals proliferated to cover the general public. Mark Edward Lender & James Kirby Martin, *Drinking in America: A History* 45-46 (1987). Multiple states passed laws prohibiting members of the public from carrying firearms while drunk.[14] To this day, many States and

---

[13] *See, e.g.*, Randolph Roth, *"Why Guns Are and Are Not the Problem,"* in Jennifer Tucker, *et al.*, *A Right to Bear Arms?: The Contested Role of History in Contemporary Debates on the Second Amendment* 116-17 (2019); Mark Edward Lender & James Kirby Martin, *Drinking in America: A History* 14-16 (1987).

[14] *See, e.g.*, 1867 Kan. Sess. Laws 25 (prohibiting those "under the influence of intoxicating drink" from carrying a pistol or other deadly weapon); 1878 Miss. Laws 175-76 (prohibiting selling weapons to a "person intoxicated"); Mo. Rev. Stat. § 1274 (1879) (prohibiting carrying "any kind of firearms" "when intoxicated or under the influence of intoxicating drinks"); 1883 Wis. Sess. Laws 290 (prohibiting person in "state of intoxication" from going "armed with any pistol or revolver"); 1909 Idaho Sess. Laws 6 (prohibiting "hav[ing] or carry[ing]" any "deadly or dangerous weapon" when "intoxicated, or under the influence of intoxicating drinks").

territories prohibit firearm possession by alcoholics.[15]  Such statutes have

been held to be "in perfect harmony with the constitution" and "a

reasonable regulation of the use of such arms" even where state

constitutions were understood to secure an individual's right to bear arms.

*State v. Shelby*, 2 S.W. 468, 469 (Mo. 1886).

These historical laws are part of this Nation's longstanding tradition

of limiting firearm possession and use during periods of intoxication—

when people are least likely to use firearms responsibly.  And, they

support modern-day application of § 922(g)(3) to do the same.

### b.    Laws Disarming Those Deemed Dangerous

Section's 922(g)(3)'s facial constitutionality is further justified by

historical laws and practices of disarming those who would pose a threat to

---

[15] *See* Ala. Code § 13A-11-72(b); Ark. Code Ann. § 5-73-309(8)(A); Colo. Rev. Stat. Ann. § 18-12-203(1)(e); Fla. Stat. Ann. § 790.06(2)(f); Ga. Code Ann. § 16-11-129(b)(2)(J); 10 Guam Code Ann. § 60109.1(b)(6); Haw. Rev. Stat. § 134-7(c)(1); Ind. Code § 35-47-1-7(5); Kan. Stat. Ann. § 21-6301(a)(13); Ky. Rev. Stat. Ann. § 237.110(4)(e); Md. Code Ann., Public Safety § 5-133(b)(4); Mass. Gen. Laws ch. 140, § 131(d)(iii)(A); Mo. Rev. Stat. § 571.070.1(2); N.J. Stat. Ann. § 2C:58-3.c.(3); N.C. Gen. Stat. § 14-415.12(b)(5); Ohio Rev. Code § 2923.13(A)(4); P.R. Laws Tit. 25, § 462a(a)(3); S.C. Code Ann. § 16-23-30(A)(1); S.D. Codified Laws § 23-7.7.1(3); W. Va. Code § 61-7-7(a)(2).

the safety of others if armed.  At a minimum, these laws support disarming

illegal drug users who have a history of drug-related violence.

English common law established the government's authority to

disarm those who posed a threat to the safety of others.  The Statute of

Northampton codified the common-law prohibition on "go[ing] armed to

terrify the King's subjects." *Sir John Knight's Case*, 3 Mod. 117, 87 Eng. Rep.

75, 76 (K.B. 1686); Statute of Northampton, 2 Edw. 3, c.3 (1328).  The

Militia Act of 1662 later authorized crown officers to seize the arms of

those "judge[d] dangerous to the Peace of the Kingdom." 13 & 14 Car. 2,

c.3, § 13 (1662).  The 1689 English Bill of Rights declared subjects' right to

possess arms, but limited the right to Protestant subjects, 1 W. & M. c.2, § 6,

and did not purport to repeal the Militia Act, which was employed into the

18th century, *see, e.g.*, *Calendar of State Papers, Domestic: William III, 1700-*

*1702*, at 233-34 (Edward Bateson ed., 1937).  Before, contemporaneous with,

and after the Bill of Rights' enactment, Parliament also enacted statues

disarming Catholics in England and Ireland. 3 Jac. I, c.5, §§ 16- 18 (1605-06);

1 W. & M. c.15, §§ 3-4 (1688); 7 Will. III c.5 (1695) (Ireland).  And, in the early

1700s, statutes disarmed Scottish individuals believed to be loyal to James II. *See, e.g.*, 1 George I, c.54 (1715); 11 George I, c.26 (1724); 19 George II, ch. 39 (1746).

The tradition continued in early American legislatures. Some laws disarmed those who carried arms in a manner that spread fear or terror. *See* 1692-1694 Mass. Acts 11-12; 1696-1701 N.H. Laws 15. Others disarmed entire groups deemed dangerous or untrustworthy, including those who refused to swear allegiance to the colony[16] or the Revolution's cause.[17] Precursors to the Second Amendment proposed in state ratifying conventions likewise confirmed that legislatures may disarm certain categories of individuals, including for "real danger of public injury." 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 665 (1971) (discussing Pennsylvania proposal). Accordingly, as one early scholar wrote, the government may

---

[16] 1 *Records of Governor & Company of the Massachusetts Bay in New England* 211-12 (Nathaniel B. Shurtleff ed., 1853) (1637 order disarming Anne Hutchinson's followers).

[17] *See, e.g.*, 4 *Journals of the Continental Congress* 201-06 (1906) (1776 resolution) ; 1775-1776 Mass. Acts 479; 1777 Pa. Laws 63; 1777 N.C. Sess. Laws 231; 1776-1777 N.J. Laws 90; 9 William Waller Hening, *Statutes at Large; Being a Collection of All the Laws of Virginia* 281-83 (1821) (1777 Va. law); 15 *The Public Records of the Colony of Connecticut from May, 1775, to June, 1776, Inclusive* 193 (Charles J. Hoadly ed., 1890) (1775 law).

restrict a person's right to carry firearms when there is "just reason to fear that he purposes to make an unlawful use of them." William Rawle, *A View of the Constitution of the United States of America* 126 (2d ed. 1829). That understanding persisted after the Civil War. In 1866, for example, a federal Reconstruction order applicable to South Carolina provided that, although the "rights of all loyal and well-disposed inhabitants to bear arms will not be infringed," "no disorderly person, vagrant, or disturber of the peace, shall be allowed to bear arms." Cong. Globe, 39th Cong., 1st Sess. 908-09 (1866).

These historical sources "support the proposition that the state can take the right to bear arms away from a category of people that it deems dangerous," *Kanter. v. Barr*, 919 F.3d 437, 464 (7th Cir. 2019) (Barrett, J., dissenting), including unlawful users of illegal drugs during periods of active use.[18] The reasons are clear: common sense establishes a clear link

---

[18] In *Rahimi*, the Supreme Court confirmed that laws disarming those deemed dangerous were codified at and after the founding: "By the time of the founding, however, state constitutions and the Second Amendment had largely eliminated governmental authority to disarm political opponents on this side of the Atlantic. But

between drug use and dangerous firearm misuse.  For example, drug users

may mishandle firearms—or use firearms to commit crimes—because of

"drug-induced changes in physiological functions, cognitive ability, and

mood." *Harmelin v. Michigan*, 501 U.S. 957, 1002 (1991) (Kennedy, J.,

concurring in part and concurring in the judgment); *see Florence v. Board of

Chosen Freeholders*, 566 U.S. 318, 332 (2012) ("The use of drugs can

embolden [individuals] in aggression.").  Illegal drug users also may use

firearms to "commit crime in order to obtain money to buy drugs," or to

commit "violent crime" that "may occur as part of the drug business or

culture." *Harmelin*, 501 U.S. at 1002 (Kennedy, J., concurring in part and

concurring in the judgment).  And, because of the *unlawful* nature of their

activities, armed drug users are more likely to have dangerous

confrontations with law enforcement officers. *United States v. Carter*, 750

F.3d 462, 469 (4th Cir. 2014).  It thus is no surprise that judges have

observed that "drug dealing" is "dangerous because [it] often lead[s] to

---

regulations targeting individuals who physically threatened others persisted." *Rahimi*,
144 S. Ct. at 1899 (citation omitted).

violence." *See, e.g., Folajtar v. Att'y Gen.*, 980 F.3d 897, 922 (3d Cir. 2020)

(Bibas, J., dissenting).[19]

Indeed, the Supreme Court recently, and explicitly, relied on surety

and going-armed laws to justify § 922(g)(8)'s constitutionality, even though

such laws did not deal solely with the risk of domestic violence and/or

strife, and only disarmed offenders after a criminal conviction. *Rahimi*, 144

S.Ct. at 1900-01, 1908-09 (noting that going-armed laws were not directed at

those found to be involved in domestic violence, only disarmed those

convicted of a crime due to their imprisonment, and did not apply after a

civil proceeding); *id*. at 1899-1901 (analogizing to surety laws, which were

not solely focused on domestic strife and did not always disarm the

offender, because such laws burdened a person's right to bear arms by

---

[19] This Court's now-vacated *Daniels* opinion recognizes that historical precursors to § 922(g)(3) establish "an undeniable throughline" of taking "guns away from persons perceived to be dangerous." *Daniels*, 77 F.4th at 352; *see id*. at 353 (explaining that "[t]ogether," these historical sources "suggest a public understanding that when a class of individuals was thought to pose a grave danger to public peace, it could be disarmed"). This historical tradition supports disarming, at a minimum, drug users whose drug use "predisposes [them] to armed conflict" or who have a "history of violent behavior." *Id*. at 354.

requiring him to post a bond or demonstrate a need for his gun). *See id*. at 1910 (Gorsuch, J., concurring) ("Notably, the surety laws that inform today's decision allowed even an individual found to pose a threat to another to 'obtain an exception if he needs his arms for self-defense.'"). Notwithstanding the differences between surety laws, going-armed laws, and § 922(g)(8)'s provision disarming those subject to domestic-violence orders, the Court found the surety and going-armed laws sufficiently similar to § 922(g)(8) because, at a general level, each law was used to disarm those who were found by a court to be a credible threat. *Id*.

Applying that reasoning here, it is evident that this nation has a history and tradition of categorically disarming those whose possession of firearms poses a heightened risk of danger due to their illegal and/or dangerous conduct.  *See Rahimi* (discussing surety and going-armed laws as relevant comparators for determining the constitutionality of § 922(g)(8)).  This includes Congress's choice to temporarily disarm those who use illegal drugs.

### c.    Laws Limiting the Rights of the Mentally Ill

Limitations historically imposed on the mentally ill also justify disarming some unlawful drug users.  At the Founding "those afflicted with mental diseases were generally treated as though they had been stripped of all . . . their rights and privileges." Albert Deutsch, *The Mentally Ill in America:  A History of their Care and Treatment from Colonial Times* 41 (1949).  Indeed, "in eighteenth-century America, justices of the peace were authorized to 'lock up' 'lunatics' who were 'dangerous to be permitted to go abroad.' " *United States v. Yancey*, 621 F.3d 681, 685 (7th Cir. 2010) (per curiam) (quoting Carlton F.W. Larson, *Four Exceptions in Search of a Theory*:  *District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1377 (2009) (quotations mark omitted), in turn quoting Henry Care, *English Liberties, or the Free-Born Subject's Inheritance* 329 (6th ed. 1774)).

It has long been understood that a person with a mental illness does not necessarily exhibit symptoms all the time.  Blackstone thus defined a "lunatic" as "one that hath lucid intervals; sometimes enjoying

his senses, and sometimes not." 1 William Blackstone, *Commentaries on the Laws of England* 294 (1765). And, Coke defined a "[l]unatique" as a person "that hath sometime his understanding, and sometime not." Edward Coke, *The First Part of the Institutes of the Lawes of England, or, A Commentarie upon Littleton* § 405, at 247 (1628). Notwithstanding the fact that mental illness can be in remission or without present symptoms, the Supreme Court has nonetheless approved "longstanding prohibitions on the possession of firearms by . . . the mentally ill." *Heller*, 554 U.S. at 626. The Supreme Court has never suggested that the validity of such laws fluctuates with the remission and relapse of a person's symptoms. *Id*. Just as Congress may disarm persons with mental illnesses even during their lucid intervals, it may disarm drug users even during their sober intervals. *But see Connelly*, 2024 WL 3963874, at *10 (suggesting that only presently intoxicated persons can be disarmed).

The Second Amendment's ratifiers understood that just as mental illness could deprive individuals of reason, so could intoxicating substances. Indeed, Benjamin Rush, a signatory of the Declaration of

Independence and a prominent physician, equated drunkenness with a "temporary fit of madness." Rush, *supra*, at 6; *see also* Carl Erik Fisher, *Urge: Our History of Addiction* 47 (Penguin 2022) (noting that "eighteenth-century writers" understood "habitual drinking" as a form of "insanity").  And, Thomas Jefferson placed "drunkards" in the same category as "infants," "maniacs" and others who "cannot take care of themselves." Nat'l Archives, *Letter from Thomas Jefferson to Samuel Smith*, 3 May 1823, https://perma.cc/2CJB-N7RS.

It is "beyond dispute that illegal drug users," like those with mental illnesses, "are likely . . . to experience altered or impaired mental states that affect their judgment and that can lead to irrational or unpredictable behavior." *Wilson v. Lynch*, 835 F.3d 1083, 1094 (9th Cir. 2016). Thus, at a minimum, history justifies disarming unlawful drug users who have used drugs so powerful that anyone who uses them is impaired in a way that is

comparable to ongoing mental illness or whose drug use is so regular and

so heavy that he is continually impaired.[20]

### d.    Laws Disarming Unlawful Drug Users and Abusers

These three longstanding regimes—*i.e.*, historical laws regulating

firearm possession and use by those under the influence of alcohol,

historical practices disarming categories of individuals whose firearm

possession presented a special danger to themselves or others, and

historical restrictions on firearm possession by the mentally ill—support

the government's authority to disarm those whose unlawful use of illegal

intoxicants presents a heightened risk of harm to themselves or others. *See*

*Rahimi*, 144 S.Ct. at 1897 (explaining that at the founding legislatures

adopted a "rang[e]" of regulations, including restrictions on gun use by

drunken New Year's Eve revelers").  "Taken together," these regulatory

regimes and historical restrictions are "relevantly similar" to § 922(g)(3). *Id*.

---

[20] This Court's vacated *Daniels* opinion states that history justifies disarming
unlawful drug users who have used drugs "so powerful that anyone who uses them is
permanently impaired in a way that is comparable to ongoing mental illness," or whose
"drug use [is] so regular and so heavy that he was continually impaired." *Daniels*, 77
F.4th at 350.

at 1901.  They imposed a similar restriction:  a temporary ban on firearm

possession by individuals during periods when they present a special risk

of harm to themselves and others.  And, they did so for the similar reason

that firearms present a unique danger when in proximity to intoxicants. *See*

*Smith v. United States*, 508 U.S. 223, 240 (1993) ("[D]rugs and guns are a

dangerous combination.").

It does not matter that § 922(g)(3) is not "identical to these founding

era regimes," because it "does not need to be." *Rahimi*, 144 S.Ct. at 1901.

Section 922(g)(3)'s temporary prohibition on the possession of firearms by

unlawful drug users fits neatly within the tradition of keeping firearms out

of the hands of the intoxicated, those who threaten others, and the mentally

ill. *See id*.

A contrary decision would create significant, negative, practical

consequences.  Section 922(g) "is no minor provision." *Rehaif v. United*

*States*, 139 S.Ct. 2191, 2201 (2019) (Alito, J., dissenting).  It "probably does

more to combat gun violence than any other federal law." *Id*.   And,

§ 922(g)(3) is one of the most frequently applied of § 922(g)'s background-

check disqualifications.[21]  Since the creation of the federal background-

check system in 1998, it has resulted in more than 217,000 denials of

firearms transactions. *See* Crim. Justice Info Servs. Div., Fed. Bureau of

Investigation, U.S. Dep't of Justice, *Federal Denials—Reasons Why the NICS*

*Section Denies, November 30, 1998 – September 30, 2023.*

**3.    Although the District Court Correctly Relied on *Daniels*, that Decision Has Been Vacated in the Light of *Rahimi*, Whose Reasoning Supports the Conclusion that § 922(g)(2) Is Constitutional on Its Face**

In reaching a contrary conclusion, the district court relied on this

Court's decision in *Daniels* (a decision that was binding at the time but has

since been vacated by the Supreme Court).  The Supreme Court vacated

*Daniels* and remanded to this Court for reconsideration in the light of

*Rahimi.  United States v. Daniels*, 77 F.4th 337 (5th Cir. 2023), *vacated and*

*remanded*, No. 23-376 (S.Ct. July 2, 2024).  Applied here, *Rahimi*'s reasoning

---

[21] In 2022, the most recent year for which statistics are available, § 922(g)(3) resulted in more than 8,000 denials—which makes it one of the most frequently applied federal disarmament provisions. *See* Crim. Justice Info. Servs. Div., Fed. Bureau of Investigation, U.S. Dep't of Justice, *National Instant Criminal Background Check System 2022 Operational Report*, at 32 (2022).

shows, and this Court's *Connelly* opinion confirms, that challenged statute
is constitutional.

As the Supreme Court explained in *Rahimi*, when a defendant presses
a facial challenge, the question is not whether the challenged regulation
"might raise constitutional concerns" in some "hypothetical scenarios."
*Rahimi*, 144 S.Ct. at 1903.  Rather, the question is whether the defendant has
"establish[ed] that no set of circumstances exists under which the Act
would be valid." *Id*. at 1898 (quoting *United States v. Salerno*, 481 U.S. 739,
745 (1987)).  Section 922(g)(3) is undoubtedly constitutional in at least some
of its applications. *See supra* Part C.2; *see also United States v. Veasley*, 98
F.4th 906, 918 (8th Cir. 2024) (upholding § 922(g)(3) against a facial Second
Amendment challenge).

Furthermore, while § 922(g)(3) is not constitutionally confined to
cases where defendants possess firearms while actively and unlawfully
under the influence of controlled substances, § 922(g)(3) is constitutional as
applied to Sam because the facts presented in response to the motion to
dismiss support the common-sense inference that Sam possessed firearms

while under the influence of marijuana. ROA.71-72. Sam's facial challenge thus fails.

*Rahimi* also clarified what qualifies as a historical analogue to sufficiently place a provision such as § 922(g)(3) within our historical tradition. *See Rahimi*, 144 S.Ct. at 1901-03 (holding that regulatory regimes and historical restrictions need only be "relevantly similar" to the challenged statute when "taken together" and holding that the challenged statute "does not need to be" "identical to these founding era regimes"). In *Rahimi*, the Supreme Court emphasized that "a 'historical twin' is not required." *Rahimi*, 144 S.Ct. at 1903 (emphasis omitted) (citation omitted). A law need only "comport with the principles underlying the Second Amendment" to be permissible. *Id*. at 1898. For the reasons explained in Parts C.1 and C.2, Section 922(g)(3) comports with the historically derived principles underlying the Second Amendment.

While historical intoxication laws are informative, there is a key difference for § 922(g)(3): historical intoxication statutes regulated firearm possession and use by individuals who consumed alcohol, which has been

a legal substance for much of our nation's history, while § 922(g)(3)

regulates firearm possession by individuals who *unlawfully use illegal drugs*.

The uniquely modern phenomenon of widespread illegal drug use, and the

attendant potential for drug-induced harm or drug-related violence,

justifies a temporary ban on the possession of firearms by unlawful users of

controlled substances. *Rahimi*, 144 S.Ct. at 1898 (directing courts to "apply[]

faithfully the balance struck by the founding generation to *modern*

*circumstances*") (emphasis added) (citation and quotation marks omitted).

   *Rahimi* cautions against considering each of the government's

historical analogues in isolation.  *Rahimi* teaches that courts should ask

what principles the government's historical analogues demonstrate when

"[t]aken together." *Rahimi*, 144 S.Ct. at 1901.  Collectively, the government's

historical analogues are consistent with the principle that the government

may temporarily prohibit firearm possession by individuals whose

unlawful use of intoxicating substances makes them a special danger to

themselves or others.

Applying the reasoning from *Rahimi* to this case, § 922(g)(3) comports

with the Second Amendment:  History and tradition support the

government's authority to disarm categories of persons whose firearm

possession would endanger themselves or others. *See Connelly*, 2024 WL

3963874, at *10 ("[O]ur history and tradition of firearms regulation show

that there are indeed some sets of circumstances where § 922(g)(3) would

be valid, such as banning presently intoxicated persons from carrying

weapons").  Consistent with that principle, Congress may temporarily

disarm unlawful users of controlled substances during periods of active

drug use, when they present a special danger of firearm misuse.  Section

922(g)(3) is, therefore, constitutional on its face. *Id*. at *10.

### 4.    Section 922(g)(3) Is Constitutional As Applied to Sam.

Section 922(g)(3) is also constitutional as applied to Sam.

Section 922(g)(3)'s application to Sam is consistent with the historical

tradition of disarming those under the influence of disorienting substances.

Sam, who admitted to using marijuana for about five years, had

drugs and drug paraphernalia in his bedroom. ROA.71-72.  In the same

room, Sam had a Glock pistol, magazines, and ammunition. ROA.71.

These facts support the reasonable inference that Sam possessed the

firearm while under the influence of unlawful controlled substances.

*See Connelly*, 2024 WL 3963874, at *10 (holding that presently intoxicated

persons can be disarmed).  Consequently, Section 922(g)(3) is constitutional

as applied to Sam.

### 5.    If This Court Disagrees, It Should Remand for Further Consideration of Sam's As-Applied Challenge.

If this Court is unsure whether Sam may be constitutionally

disarmed, it should vacate the district court's order and remand for

additional proceedings.  The district court's pre-trial resolution of Sam's as-

applied challenge was premature because further development of material

facts about the extent of Sam's drug use would aid in resolving Sam's as-

applied challenge.

A motion to dismiss may be resolved pretrial only where it presents

claims that "can be determined without a trial on the merits." Fed. R. Crim.

P. 12(b)(3).  The rule does not permit pre-trial resolution of individualized,

offender-specific facts. *See United States v. Rodriguez-Rivera*, 918 F.3d 32, 35

(1st Cir. 2019); *see also United States v. Pope*, 613 F.3d 1255, 1261-63 (10th Cir. 2010) (as-applied Second Amendment challenge could not be considered pretrial where, to prevail, "disputed facts outside the indictment must be found in [defendant's] favor"); *United States v. Sampson*, 898 F.3d 270, 285 (2d Cir. 2018) (" '[W]e simply cannot approve dismissal of an indictment on the basis of predictions as to what the trial evidence will be.' " (quoting *United States v. DeLaurentis*, 230 F.3d 659, 661 (3d Cir. 2000)).

Here, the district court granted Sam's pre-trial motion to dismiss before the government could adduce at trial evidence of the full extent of Sam's drug use. To the extent this Court finds the current record lacking, a remand is appropriate for additional proceedings, including to permit the district court to decide the as-applied question in the light of *Rahimi*, now that *Daniels* has been vacated by the Supreme Court.

Further proceedings in the district court would be probative of at least two issues relevant to Sam's as-applied challenge. *First*, additional proceedings would permit further development of whether Sam possessed firearms while under the influence of controlled substances. Drug users

who possess firearms are apt to retain possession while under the

influence; they are unlikely to put their guns away before using drugs and

to retrieve them only after regaining sobriety.  Given Sam's admitted use of

marijuana for approximately five years, it is reasonable to conclude that

Sam possessed his firearm, magazines, and ammunition—which he stored

in the same bedroom as the illegal drugs and drug paraphernalia,

including scales, *see* ROA.71-72—while under the influence of illegal drugs.

***Second***, additional proceedings would permit further development of the

extent and nature of Sam's drug use.  Evidence about the full extent of

Sam's drug use, are probative of whether Sam used drugs in a way to

render him continually impaired.

Thus, if this Court is unsure whether Sam's as-applied challenge has

merits, it should vacate the district court's order and remand for additional

proceedings.

# CONCLUSION

This Court should reverse the district court's judgment or, alternatively, vacate and remand for additional proceedings.

Respectfully submitted,

TODD W. GEE
*United States Attorney for the*
*Southern District of Mississippi*

By:  /s/ *Jennifer Case*

JENNIFER CASE
*Assistant United States Attorney*
Mississippi Bar Number 104238

KEVIN PAYNE
*Assistant United States Attorney*
Mississippi Bar Number 103478
501 E. Court Street, Suite 4.430
Jackson, Mississippi  39201
Dated:  October 15, 2024     (601) 965-4480

## CERTIFICATE OF SERVICE

I hereby certify that on this day, I electronically filed the foregoing with the Clerk of the Court using the Electronic Case Filing system (ECF), which caused the filing to be served on counsel of record.

Dated:  October 15, 2024

_/s/ Jennifer Case_

JENNIFER CASE
*Assistant United States Attorney*

# CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) because this brief contains 9,395 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(f).

2.  This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the typestyle requirements of FED. R. APP. 32(a)(6) because the brief has been prepared using Palatino Linotype 14-point font produced by MS Word software; the footnotes are in 12-point type.

3.  Privacy redactions required by FIFTH CIR. R. 25.2.13 have been made to this brief.

4.  The electronic submission of this brief is an exact copy of the paper document as required by FIFTH CIR. R. 25.2.1.

5.  This brief has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.

Dated:  October 15, 2024

/s/ *Jennifer Case*
_____
JENNIFER CASE
*Assistant United States Attorney*